# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 92-KA-01107-SCT

*HENRY C. MILLER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 1/25/85 |
| TRIAL JUDGE: | HON. FRANK ALLISON RUSSELL |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | KENT E. SMITH |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | NA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 6/13/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 7/8/96 |

**EN BANC.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Henry C. Miller was granted an out-of-time appeal of his January 25, 1985, conviction of murder and sentence of life imprisonment. Miller was convicted of the June 22, 1984, shooting death of his wife by a jury of the Circuit Court of Tishomingo County, Mississippi. At trial, Miller asked for and was denied a jury instruction on accident or misfortune. Finding the trial court erred in refusing such an instruction, we reverse and remand for a new trial on the merits.[1]

## STATEMENT OF FACTS

¶2. Sometime between 11:00 p.m. and midnight on Friday, June 22, 1984, Henry C. Miller (Miller) and his girlfriend, Edith Critchett (Critchett), returned to the Little Creek Motel, in Iuka, Mississippi, where they were living together. The two had been to Cherokee, Alabama, drinking and celebrating Critchett's birthday which had been earlier in the week. After pulling into the motel parking lot and parking in front of the door to their room, Miller got out of the truck to unlock the door while Critchett stayed in the truck. At that time Miller's wife, Mary Ann Miller (Mary), from whom he was separated, appeared with their three young children. Mary pulled Critchett out of the truck. Miller separated the two women. From here the testimony differs.

## EDITH CRITCHETT

¶3. Critchett testified that Miller became angry with Mary for pulling Critchett out of the truck and made Mary apologize. When asked what she was doing there, Mary stated that she thought Miller might want to see his children. Miller told Mary to just leave the children, the oldest of whom was five years old, with him. Critchett had never met Mary or the children before that night.

¶4. Critchett testified that at that point Miller opened the door to their room and everyone went inside. Critchett and the three children sat on the bed and Mary sat on the couch. Critchett stated that Miller became angry with Mary. He asked her why she came back and would not just leave him alone. Critchett told Mary that she should not have pulled her out of the truck. At that point Miller became really angry, yelling and hitting Mary while she was sitting on the couch. Mary put up her hands to protect her face, but Miller continued to hit her. Miller then removed a gun from a drawer. Critchett testified that at this point Miller:

> walked back over to her [Mary] and he was loading it and unloading it and he fired the first shot and I tried to stop him, I told him no, not to do that, I said that she wasn't worth it, the type of person she was and he wouldn't listen to me, he pushed me back on the bed and I don't quite remember what he said, you know, but he didn't want me involved and I tried to stop him but he wouldn't listen to me and the kids were yelling, no, daddy, no, daddy and kept saying that and then finally he shot and she just tilted her head over and he left. He said that he had to get out of there, he had to leave and so he left.

Critchett stated that when Miller shot Mary in the head, Mary was sitting on the couch and was not threatening Miller in any way. After Miller left, Critchett took the children out of the room and got a neighbor. The neighbor called an ambulance and the police. When the police arrived, Critchett was put in a police car and taken to jail where she stayed until she was released the next afternoon.

¶5. On cross-examination, Critchett admitted making three separate statements to police before being released. The first two differed significantly from her trial testimony in that she stated that she did not enter the hotel room with Miller and Mary, but stayed outside and did not witness the shooting. She also admitted telling police in her first two statements that she only heard one gunshot instead the two testified to at trial. Critchett testified that she lied in the first two statements to protect Miller and because she was afraid of Miller and thought to stay in his good graces by lying about what she saw. Later she decided to do something for Mary and the children and so she told the truth about being in the room at the time of the shooting. It was after giving this third statement that Critchett was released from jail. However, the time frame is unclear and there is no evidence that the changed statement and her release were related.

¶6. After being released from jail Critchett returned to the same room at the Little Creek Motel where the murder had occurred and continued to live there. Critchett stated that after the shooting Miller moved in with his sister. He did continue to visit Critchett occasionally and at one point they rented a larger room and lived together for about a week. Critchett and Miller then had an argument and he moved out permanently.

## HENRY C. MILLER

¶7. Miller admitted shooting his wife, but stated it was an accident. On the night of the shooting it had been at least a month since Miller had seen Mary and he had not seen his children since January, five months

earlier. Miller stated that he had tried to reconcile with Mary a month before the shooting, but she wanted a divorce and so he agreed. A week later Miller moved in with Critchett.

¶8. Miller stated that on the night of the shooting he and Critchett parked in front of their room and he got out of the truck. Mary and the children were there and Mary pulled Critchett out of the truck. Miller testified that after he separated Mary and Critchett, he, Mary and the children went inside the motel room while Critchett stayed outside. Miller stated that he had Mary's state income tax check and they went in the room so he could get it for her and so they could talk. He stated that Critchett stayed outside because Mary was upset and was trying to get her hands on Critchett.

¶9. Once inside the room, the children sat on the bed and Mary sat down on the couch. Miller stated that his gun was lying on top of the nightstand beside the bed, not in the drawer as Critchett testified. Miller testified that he went to get the income tax check out of a drawer and when he turned around Mary lunged for the gun. Miller beat her to it and they fought over the gun and it discharged once, striking Mary. On cross-examination Miller described the shooting, stating:

> Well, she went for the gun and I went for the gun and we both had got to it at about the same time and I got ahold of it and it was in a holster and somehow or another it got out of the holster and the hammer on the gun was cocked and it went off and it shot her and she fell onto the couch and fell over.

¶10. Miller stated that he had been drinking heavily and everything happened so fast he could not remember exactly how it all happened. Miller testified that after the gun went off he could not think straight, so he just turned around and left, leaving his wife bleeding and his children screaming.

¶11. Miller was arrested at his sister's house, several hours after the shooting. He gave a written statement to police around 10:30 a.m. the next morning. That statement varied from his trial testimony in one significant detail. In the written statement he made no mention of a struggle over the gun. The statement read, in part:

> After we got in my room it started again. I was going to give my wife the state income tax check which was in my room and she jumped up and was acting crazy and hitting me and was trying to get the door open to get to Edith. I got a pistol, my 38 caliber revolver-nickel plated- from the night stand and told her (my wife) to quiet down but she didn't. Then I really don't know what happened the gun went off one time striking her (my wife) and she fell over on the couch and I turned around and left the room. I went to my sister's home who lives in Burnsville, MS. Her name is Juanita Austin. I threw the pistol out of the pickup somewhere between the motel room and my sister's home. I think the time this happened was between 10 p.m. and midnight last night. I told my sister what had happened the best I could. My sister told me she would have to call the law and I told her O.K. and to tell them where I was so they could come after me and they did.

### BOBBY L. JAMES

¶12. James, an Iuka police officer at the time of the murder, was on patrol when he received a call about the shooting shortly before midnight. He talked to several people who were standing outside and was informed there had been a shooting. James stated that, "when I opened the door and walked in, it [sic] was a couch against the wall, the couch was facing the east and she was sitting on the north end of it humped

over to her left side . . . she had blood and a hole in the side of her head."

¶13. James testified on cross-examination that Critchett was standing outside at this time and when he asked who was in the room at the time of the shooting she replied that she, Miller and the children had been in the room. James put Critchett in the patrol car and sent her to the jail house. James was also present at the jail when Miller was located and brought in around 2:30 a.m. or 3:00 a.m. that morning.

### DALE WHITE

¶14. White, the Tishomingo County coroner, pronounced Mary dead. White described what he found during his examination as follows: "I found what appeared to be a gunshot wound to the head; entrance wound on one side, exit wound on the other side; an extreme amount of blood around the head and at the shoulders. There were no other fresh marks of trauma to the body . . . ."

¶15. After examining Mary, White went with a police officer to the motel room were she had been shot. White gave the following description of what he found:

> I walked in the door to a relatively small room. . . . As you walk through the door there is a couch to the left, a bed to the right and by the couch on the left is a small closet, and from the bed on to the back of the room is a small kitchen area and bath; at the, from the door at the far end of the couch there was a small box containing cooking utensils that had been splattered with blood and there was a pooling of blood in the box, by the box and on the carpet at the end of the couch.

On cross-examination White testified that it was his opinion that Mary had been shot while on the couch. White stated he came to this conclusion

> [b]ecause of the size of the building and the location of the blood and where the ambulance said that they picked her up from and that would be that when they walked into the room, the victim was sitting on the couch in a slumped position, bent over the left railing face down and blood dripping to the floor.

### KENNY DICKERSON

¶16. Dickerson, a criminal investigator with the Mississippi Highway Safety Patrol at the time of the murder, investigated the shooting. Dickerson received a call at his home in Holly Springs, Mississippi, shortly after midnight on the night of the shooting. He immediately drove to the sheriff's office in Iuka, arriving at approximately 1:40 a.m. Dickerson stated that he advised Miller of his rights and attempted to question him around 2:00 a.m. or 3:00 a.m. that morning but Miller was intoxicated and stated that he did not want to talk. Dickerson ceased questioning him at that time. The next morning around 10:20 Dickerson again advised Miller of his rights and Miller signed a waiver. Dickerson stated that Miller appeared to be sober at that time and he appeared to understand his rights and the effect of a waiver. Thereafter, Miller was questioned and Dickerson wrote out a statement concerning the events surrounding the shooting. The statement was read to Miller and Miller signed it. Sheriff Bob Payne and Chief of Police Joel Holliman witnessed Miller sign the written statement.

### JOHNNY NUNNALLY

¶17. Nunnally, an Iuka police officer at the time of the shooting, testified for the defense. Nunnally testified

that Miller is his half nephew. Miller's sister called Nunnally's wife and told her that Miller was at her house. Nunnally's wife called him and Nunnally drove to Burnsville and picked up Miller and took him back to the jail in Iuka.

¶18. Nunnally stated that he saw Critchett at the jail and heard her say that she was outside at the time of the shooting and had not seen anything. Nunnally testified that he saw Critchett a day or two after the shooting and she had a black eye and her face was scratched. Critchett told Nunnally that Mary had done it. Nunnally stated that Critchett did not seem afraid of Miller and had called his house after the shooting looking for Miller.

¶19. After Miller's conviction and sentence, appellate counsel was appointed and a notice of appeal was filed. Subsequently, Miller escaped from custody and remained at large for approximately one year. Notice of Miller's appeal was never filed with this Court. After being recaptured Miller filed several motions for new trial, out-of-time direct appeal, and post-conviction relief, all of which were denied by the lower court. Ultimately, Miller filed with this Court a request for writ of mandamus. This Court, in an order dated June 3, 1992, and signed by then-Chief Justice Roy Noble Lee, remanded the cause to the Circuit Court for "reconsideration of Miller's request for out of time direct appeal, or alternatively, his request for post-conviction collateral relief." Subsequently, counsel was appointed, a hearing was held, and the Circuit Court issued an order granting Miller an out-of-time appeal.

## DISCUSSION

### THE APPELLANT WAS CONVICTED OF MURDER WITHOUT THE COURT'S HAVING PROPERLY INSTRUCTED THE JURY.

¶20. Miller maintains that the lower court's refusal of two of his proposed jury instructions, D-9 and D-10, was reversible error. Both D-9 and D-10 were excusable homicide instructions which the lower court refused, stating that Miss. Code Ann. § 97-3-17, the statute dealing with excusable homicide, does not extend to homicides committed during the course of an unlawful act or to homicides committed with a dangerous weapon. Miller argues that although a dangerous weapon was involved in this case, under Miss. Code Ann. § 97-3-17, the jury could have still found the shooting to be excusable homicide if they found Mary's death was the result of accident or misfortune. The State argues that, pursuant to settled case law, excusable homicide does not extend to homicides committed with a deadly weapon. The State cites three cases in which this Court has stated that the "statute . . . defining excusable homicide does not extend to homicide committed in the course of an unlawful act nor to homicide committed with a deadly weapon." *Hailes v. State*, 315 So. 2d 917, 918 (Miss. 1975) (citing *Powell v. State*, 279 So. 2d 161 (Miss. 1973)). *See also Wood v. State*, 64 Miss. 731, 2 So. 247 (1887). While these cases seem to say that a homicide can never be excusable when a gun, or other dangerous weapon, is used, that is not the law.

¶21. Miss. Code Ann. § 97-3-17 provides for three scenarios in which a homicide may be excusable:

The killing of any human being by the act, procurement, or omission of another shall be excusable:

(a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;

(b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;

(c) When committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.

¶22. Case law indicates that these three sections need not be taken as a whole, but may be read and applied separately. In the cases cited by the State, the facts did not fit any of the three excuses. All three of those cases involved an unlawful act or sudden combat coupled with the use of a dangerous weapon and therefore the homicides could not be excusable and an accident instruction was not appropriate.

¶23. In *Hailes* the evidence showed that the defendant shot and killed her companion while in the commission of an unlawful act. In *Powell*, the defendant, after locating his wife at a tavern with another man, returned to his car and got a pistol which he placed in his pocket. Powell then went to confront his wife and the man she was with. Powell twice hit his wife's companion in the head with the gun, the second time the gun fired killing his wife's companion. *Wood* was an appeal from an assault conviction, where the victim was stabbed with a knife during a sudden combat situation. In each of these cases the Court held that the applicable excusable homicide statute did not extend to homicides committed with a dangerous weapon. However, if the facts of each case are taken into account, it is apparent that it was not merely the use of a dangerous weapon that precluded the granting of an excusable homicide instruction, but rather such an instruction was not warranted because the homicide occurred with a dangerous weapon during sudden combat or during the commission of an unlawful act.

¶24. The clear language of the statute and its application by this Court shows that the only time a homicide cannot be excusable when a dangerous weapon is used is when it takes place during sudden combat. This Court has never held an accident or misfortune instruction to be improper when a dangerous weapon was used and there was evidence that the homicide was committed while the defendant was engaged in lawful conduct, exhibiting usual and ordinary caution, and there was no unlawful intent. Whether or not a killing was the result of accident of misfortune is a question for the jury to decide after proper instruction. *Day v. State*, 589 So. 2d 637, 643 (Miss. 1991).

¶25. There are no Mississippi cases precisely on point, but one which is similar factually to the case sub judice is *Taylor v. State*, 597 So. 2d 192 (Miss. 1992). In that case Taylor and his former girlfriend, Linda Johnson, were in Taylor's trailer arguing. Taylor maintained that Johnson went for a gun Taylor kept under the cushions of his couch. The two struggled over the gun and as Taylor lost his balance and fell the gun discharged shooting Johnson in the head, killing her. Taylor never deviated from his contention that the killing was an accident. The State was granted two jury instructions dealing with self-defense, which Taylor never asserted. Taylor was found guilty of murder. This Court reversed stating:

> Taylor's theory of defense throughout was one of accident or excusable homicide. See Miss. Code Ann. § 97-3-17(b) (Supp. 1987). The instruction, considered by itself, deflects the jury's attention from accident as *the* defense. One cannot read the instruction without forming the opinion that the principal defense to be considered is self-defense.

*Taylor*, 597 So. 2d at 197.

¶26. In *Scott v. State*, 466 So. 2d 580 (Miss. 1984), Scott was convicted of murder for the shooting death of W.C. "Dub" Turner. Scott was in Turner's apartment helping him repair his stereo when Turner pulled out a gun and fired it twice in Scott's direction. Scott claimed that he and Turner "scuffled" and the

gun discharged two more times. At trial, jury instruction S-1 listed only subsection (c) of Miss. Code Ann. § 97-3-17. This Court reversed stating:

> The instruction completely fails to mention accident, misfortune, the heat of passion, or any sudden and sufficient provocation. Although Instruction D-4 did mention those factors, it does not remedy the defect in S-1. This is so because S-1 is conclusive in nature and therefore in hopeless conflict with an instruction like D-4 which list other occasion in which a homicide may be excusable.

*Scott*, 446 So. 2d at 583.

¶27. In *Nicolaou v. State*, 534 So. 2d 168 (Miss. 1988), this Court stated, in dicta,

> A killing with a deadly weapon may be susceptible of clear explanation by the accused or eyewitnesses as an *accident*, or justified as having been committed by the accused acting in lawful self-defense, or mitigated manslaughter. When no such proof is forthcoming the jury is warranted in finding the accused guilty of murder.

*Id.* at 172 (emphasis added).

¶28. Two recent cases dealing with the defense of accident or misfortune also seem to indicate that it takes something more than just a killing done with a deadly weapon before a homicide may not be found to be excusable under Miss. Code Ann. § 97-3-17. In *Thibodeaux v. State*, 652 So. 2d 153 (Miss. 1995), the defendant argued that while headlighting deer his gun accidentally discharged killing a game warden. This Court held that even if the gun fired accidentally, the homicide was not excusable under Miss. Code Ann. § 97-3-17 because:

> neither subsection (a) nor (c) of the cited statute is available to Thibodeaux since he was in the process of headlighting deer, an unlawful activity under (a), and in possession of a firearm, a dangerous weapon under (c). The statute defining excusable homicide does not extend to homicide committed in the course of an unlawful act nor to homicide committed with a deadly weapon. Neither is "heat of passion" suggested or argued by Thibodeaux. Thus, his contention that the application of *Weathersby* Rule results in a finding that he was only guilty of an accidental, excusable homicide is unsupported.

*Thibodeaux*, 652 So. 2d at 167 (citations omitted).

¶29. In *Nicholson ex rel. Gollott v. State*, 672 So. 2d 744 (Miss. 1996), this Court held that Gollot, who was convicted of manslaughter for fatally shooting his ex-wife, Diane, was not entitled to an accident instruction. Gollot claimed that he accidentally killed Diane while he was attempting suicide. The Court held that suicide is unlawful at common law and therefore, under Miss. Code Ann. § 97-17-3(a), the killing could not be excusable. This Court made no issue of the fact that a dangerous weapon was used.

¶30. It is clear from a reading of these cases that this Court intends that a defendant have the right to have the jury instructed on excusable homicide in certain cases even when a dangerous weapon was involved. If not there could never be such a thing as an accidental shooting or a hunting accident.

¶31. If the testimony is looked to in the light most favorable to Miller, then an excusable homicide instruction was appropriate since under Miller's version of the events he and Mary were struggling over the

gun when it discharged, killing her. This is not a sudden combat situation such as contemplated by the legislature under subsection (c) nor did the shooting happen during the commission of an unlawful act which would exclude subsection (a). Miller should have been allowed an instruction on his defense of accident or misfortune.

¶32. Even though the trial court allowed jury instruction D-12, this was not sufficient. D-12 merely informed the jury that Miller could raise the defense of accident or misfortune. The jury was not instructed on what such a defense entailed. The lower court erred in refusing proposed instruction D-9 which read:

> The killing of a human being is an excusable homicide if the defendant's act which caused the death of _____ was a result of an accident and misfortune in doing a lawful act by lawful means with usual and ordinary caution and without unlawful intent. If _____ death was caused by the discharge of the pistol accidentally while in the possession of the defendant and that the defendant used usual and ordinary caution and had no lawful intent, then the homicide is excusable.

> If you do find that the shooting was accidental and thus excusable, then you shall find for the defendant and return a verdict of NOT GUILTY.

¶33. Although D-9 could have been better written by setting out all three subsections under Miss. Code Ann. § 97-17-3 or by applying the applicable facts, the point remains that Miller was entitled to an accident instruction. However, proposed jury instruction D-10 was a confusing self-defense/accident instruction and it cannot be said that the lower court erred in refusing it.

¶34. This issue is meritorious and this case is reversed because of the lower court's failure to grant Miller an instruction on his defense of accident.

## CONCLUSION

¶35. The lower court committed reversible error in refusing to grant Miller an accident instruction pursuant to Miss. Code Ann. § 97-3-17. Therefore, this case is reversed and remanded for a new trial on the merits.

¶36. **REVERSED AND REMANDED.**

**LEE, C.J., PRATHER, P.J., PITTMAN, BANKS, McRAE, ROBERTS AND SMITH , JJ., CONCUR. MILLS, J., NOT PARTICIPATING.**

1. Although Miller asserted three issues on appeal, we find issue two to be dispositive in this case and therefore the other issues will not be addressed.